USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/10/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------X
IN RE 477 WEST 142ND STREET HOUSING      :
DEV. FUND CORP.,                         :
                            Debtor.      :
----------------------------------------------------------:
DR. QUEEN MOTHER DELOIS BLAKELY,      X
                                         :
                            Appellant,   :
                                         :
AMSTERDAM KEY ASSOCIATES LLC,            :
                                         :
                            Appellee.    :
----------------------------------------------------------X
```

20-CV-6771 (VEC)
20-CV-7458 (VEC)
20-CV-7459 (VEC)

OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

Dr. Queen Mother Delois Blakely ("Appellant" or "Dr. Blakely"), proceeding *pro se*,

appeals three orders of the Bankruptcy Court for the Southern District of New York (Sean H.

Lane, B.J.) (the "Bankruptcy Court"). The three orders (1) denied a motion for reconsideration,

(2) entered judgment in favor of Amsterdam Key Associates LLC ("Appellee" or "Amsterdam")

in an adversary proceeding; and (3) dismissed an adversary proceeding brought by Dr. Blakely.

For the reasons discussed below, the decisions of the Bankruptcy Court are AFFIRMED, and this

case is DISMISSED.

## BACKGROUND

Dr. Blakely[1] currently resides at 477 West 142nd Street (the "Property") with her disabled

daughter. *See* Mem. of Law, 20-CV-6771, Dkt. 16 at 5. In 1982, Appellant organized the 477

West 142nd Street Housing Development Fund Corporation cooperative (the "Coop" or the

"Debtor"), a limited equity housing cooperative, through New York City's Tenant Interim Lease

---

[1] Appellant is by all accounts a social justice activist and an advocate for the people of Harlem. *See* Mem. of
Law, 20-CV-6771, Dkt. 16 at 6–9; Designation of Items on Appeal, 20-CV-7459, Dkt. 4 at 10. She is also the
founder of a nonprofit, the New Future Foundation, which offers educational and recreational programming for
children. *See* Mem. of Law, Dkt. 16 at 7. Nineteen third parties have submitted letters of support on behalf of
Appellant; many of the letters praised Appellant's longstanding record of advocacy and humanitarian work. *See*
Third Party Letters, 20-CV-6771, Dkts. 25, 28–29, 33–42, 45–46, 48–50, 52, 54.

program.  That program enabled low-income residents to form Housing Development Fund

Corporation coops ("HDFCs").[2]  *See* Opinion, 20-AP-1004, Dkt. 6 at 3; Mem. of Law, Dkt. 16 at

9–10.  On December 7, 1982, New York City (the "City") sold the Property to the Coop.  *See*

Mem. of Law, Dkt. 16 at 9–10.  Appellant, as well as six other low-income residents, acquired

shares in the Coop for $250 per apartment.  *Id*.

In 2003, the City commenced a tax foreclosure action against the Coop for failure to pay

property taxes; eventually the City obtained a judgment of foreclosure.  *See* Opinion, 20-AP-

1004, Dkt. 6 at 3; Amended Disclosure Statement, 15-BK-12178, Dkt. 139 at 6.  On September

20, 2007, in order to pay the tax debt and avoid foreclosure, the Coop borrowed $650,000 (the

"Loan"), secured by a mortgage on the Property, from Madison Park Investors LLC and ER

Holdings LLC ("Original Lenders").  *See* Opinion, 20-AP-1004, Dkt. 6 at 3; Mem. of Law, Dkt.

16 at 12.

Appellant characterizes the Loan as predatory.  *See* Mem. of Law, Dkt. 16 at 31–32.  She

alleges that the Original Lenders made the Loan knowing that the Coop would default so that

they could foreclose on and eventually own the Property.  *See id.* at 12.  Appellant further asserts

that Shirley Pitts, a fellow tenant-shareholder of the Coop, orchestrated the Original Loan

without the consent of the Coop's board.  *See id.* at 32; 2007 Complaint, 20-CV-6771, Dkt. 16 at

193.  According to Appellant, Pitts secured the Loan with the help of three individuals: Nathaniel

McLeon, a man who would later be indicted for practicing law without a license; Ken Bey, the

---

[2]      HDFCs were popular in the 1970s when the City acquired buildings that had been abandoned by their landlords.  The City rehabilitated the buildings and sold them to HDFCs at below-market prices.  *See* Columbia Report, 20-CV-6771, Dkt. 51 at 12.  An HDFC functions, for the most part, like any other residential coop.  The tenant-shareholders pay maintenance fees, which cover utilities, taxes, and upkeep.  But unlike most New York City residential coops, HDFC residents are low-income New Yorkers, and the HDFC pays reduced property taxes.  *See id.* at 13–14.

managing agent of the Property; and Margaret Callender, another tenant-shareholder of the

Coop.  *See* Mem. of Law, Dkt. 16 at 32; 2007 Complaint, Dkt. 16 at 193.

On November 16, 2007, Dr. Blakely sued Pitts, Bey, Callender, and the Original Lenders

in state court, asking the court for "all appropriate legal and equitable relief," including "setting

aside" the Loan and an award of damages.  *See* 2007 Complaint, Dkt. 16 at 195; *see also* Mem.

of Law, Dkt. 16 at 64–65.  Dr. Blakely's complaint was eventually dismissed.  *See* Dismissal of

2007 Complaint, 20-CV-6771, Dkt. 16 at 227.[3]

In February 2009, after the Coop had fallen behind on repaying the Loan, the Original

Lenders commenced a mortgage foreclosure action.  *See* Opinion, 20-AP-1004, Dkt. 6 at 4.  On

September 4, 2013, the New York State Supreme Court granted summary judgment to the

Original Lenders.  *See Madison Park Invs. LLC v. 477 West 142nd St. Hous. Dev. Fund Corp.*,

No. 600313/2009 (Sup. Ct. N.Y. Cnty. 2013) ("State Court Opinion").[4]

In March 2015, the Original Lenders assigned the mortgage to a newly formed company,

477 W. 142nd Funding LLC ("477 Funding").  *See* Assignment of Mortgage, 15-BK-12178, Dkt.

20-5.  In June 2015, 477 Funding obtained a judgment of foreclosure from the New York State

---

[3]       In 2010, Appellant commenced another lawsuit against the same defendants.  It was also eventually
dismissed.  *Delois Blakely v. Ken Bey*, No. 101481/2010 (N.Y. Sup. Ct. 2010).

[4]       The New York State Supreme Court's 2013 decision granting summary judgment to the Original Lenders is
not a part of the record, but the Court takes judicial notice of it.  A court may take judicial notice of another court's
decision "to establish its existence and that the court made certain factual findings, which is necessary to complete
the narrative of [a plaintiff's] federal action and provide context for [a defendant's] defenses."  *Hurd v.
Fredenburgh*, 984 F.3d 1075, 1083 n.2 (2d Cir. 2021) (citing *Glob. Network Commc'ns, Inc. v. City of New York*,
458 F.3d 150, 157 (2d Cir. 2006)).  A copy of the decision is attached as an appendix to this Opinion.

In the 2013 State Court Opinion, Justice Tingling found that the Original Lenders had not violated New
York Banking Law § 6-L(2)(k), which prohibits predatory home loans.  *See* State Court Opinion at 8.  He did,
however, note in dicta that Pitts had submitted fraudulent board minutes purporting to reflect that the Coop's board
had approved taking the Loan, that McLeon had falsely represented himself to be an attorney, and that McLeon had
falsely stated that $200,000 of the Loan proceeds had been placed in an escrow account.  Justice Tingling called the
events surrounding the mortgage loan a "travesty," *see* State Court Opinion at 1, and found that the terms of the
mortgage loan were "preposterous," *see id.* at 8.

Supreme Court.  *See* Opinion, 20-AP-1004, Dkt. 6 at 4.  The Property was noticed for a foreclosure sale on August 5, 2015.  To avoid the sale, the Coop filed for Chapter 11 protection. *Id*.

In March 2016, following prolonged disputes among Appellant and the remaining tenant-shareholders, the Bankruptcy Court appointed a Chapter 11 Trustee (the "Trustee") to monitor and supervise the bankruptcy proceedings.  *See* Opinion, 20-AP-1004, Dkt. 6 at 4–5.  After the Trustee was himself unable to navigate the disputes among the shareholders, he elected to stop pursuing reorganization, which would have maintained the tenants as shareholders; instead, he decided to sell the Property and to dissolve the Coop.  *Id.* at 5.

When the Trustee moved to sell the Property, 477 Funding, the Coop's largest creditor, proposed a reorganization plan.  *See* Appellee's Complaint, 19-AP-1126, Dkt. 1 at 3.  The draft plan proposed that the Property would be sold, without an auction process, to an entity designated by 477 Funding.  The entity, initially referred to as "Newco,"[5] later became Amsterdam Key Associates LLC, the Appellee in these appeals.  *See* Resp., 20-CV-6771, Dkt. 21 at 9.

The plan proposed by Amsterdam was extraordinarily generous to the existing shareholders.  It included giving each existing shareholder-tenant a "Life Occupancy Lease." *See* Opinion, 20-AP-1004, Dkt. 6 at 6.  Each Life Occupancy Lease would last for the lifetime of the associated shareholder-tenant, but it would not extend to their children.  477 Funding proposed an exception for Appellant — as to Dr. Blakely, the Life Occupancy Lease would last for the lifetime of her disabled daughter.  The proposed plan also waived any delinquencies by the current shareholders with respect to past maintenance payments, set future rent at $400 per

---

[5]     Although Dr. Blakely saw something nefarious about "Newco," *see* Second Reply, 20-CV-6771, Dkt. 30 at 5, 19–20; Third Reply, 20-CV-6771, Dkt. 32 at 5, 6, "Newco" is simply a temporary name used to describe a corporate entity planned to be formed for a particular purpose.

month, and guaranteed that the $400 rent would not be subject to any increases.  *See id.*  For a group of tenant-shareholders about to be foreclosed upon, it was, in short, the real estate deal of New Yorkers' dreams.

By June 30, 2017, apparently recognizing the benefits of the proposal and the lack of alternatives that would maintain the Coop as a Coop, all of the remaining shareholder-tenants, including Appellant, had consented in writing to the proposed reorganization plan.  *See id.* at 5. Given the unanimous support from the shareholders for the proposed plan, the Trustee opted to move forward with it and not to initiate an auction process to sell the Property.  *See* Appellee's Complaint, 19-AP-1126, Dkt. 1 at 3.  As the Bankruptcy Court later explained, "the trustee had essentially teed up the sale of the property and held off on going ahead with that sale [because he found a] better way, which allowed tenants — shareholder tenants to stay in the building, something that I can't imagine would be on the table in a sale by anybody who wanted to purchase the property."  Hearing Tr., 15-BK-12178, Dkt. 157 at 12.

On August 18, 2017, 477 Funding filed a revised version of the reorganization plan.  *See* Opinion, 20-AP-1004, Dkt. 6 at 6.  The revised reorganization plan (the "Final Plan") provided that each shareholder of the Coop would receive a Life Occupancy Lease *only if* the shareholder did not withdraw his or her consent to the plan or otherwise object to it.  *See* Final Plan, 15-BK-12178, Dkt. 133 at 14 (granting a Life Occupancy Lease to current tenants who "support confirmation" of the plan and "actually vote in favor" of it).  On September 28, 2017, the Bankruptcy Court held a hearing on the Final Plan.  *See* Opinion, 20-AP-1004, Dkt. 6 at 8. Appellant was present with an attorney during this hearing; she did not object or renege on her previously-provided consent to the reorganization plan.  *See id*.  The Bankruptcy Court approved the disclosure statement.  *See id*.

On November 1, 2017, Appellant objected to the Final Plan. *See id.* at 8–9. At a November 9, 2017 hearing, Appellant, who appeared *pro se*, stated her objections to the Final Plan. S*ee* Order Denying Motion for Reconsideration, 20-CV-6771, Dkt. 1 at 9–10. Although the Bankruptcy Court reminded Appellant that objecting to the confirmation of the Final Plan would cause her to lose her entitlement to the Life Occupancy Lease, Appellant persisted with her objections.[6] *See* Mem. of Law, Dkt. 16 at 48–49.

On December 4, 2017, the Bankruptcy Court overruled Appellant's objections and confirmed the Final Plan, which formally authorized Amsterdam Key Associates LLC to purchase the Property. *See* Opinion, 20-AP-1004, Dkt. 6 at 8–9. The sale closed on February 1, 2018. *See id.* at 10.

On May 11, 2018, having failed to appeal the confirmation of the Final Plan before the sale of the Property, Appellant moved in Bankruptcy Court to "reject" the Trustee's actions with respect to the confirmation of the Final Plan (the "Rejection Motion"). *See* Rejection Motion, 15-BK-12178, Dkt. 177. Most of her arguments mirrored those in her November 1, 2017 objections, which the Bankruptcy Court had overruled more than six months earlier. *Compare* Rejection Motion, 15-BK-12178, Dkt. 177 at 3–10 *with* Appellant's Objections to the Final Plan, 15-BK-12178, Dkt. 150 at 1–7.

On June 11, 2018, the Bankruptcy Court denied the Rejection Motion. *See* Order Denying Motion, 15-BK-12178, Dkt. 186. Appellant appealed that decision to the District Court, which affirmed the Bankruptcy Court. *See* District Court Opinion, 15-BK-12178, Dkt. 207. In his decision, District Judge John Koeltl found that (1) the Rejection Motion was an impermissible collateral attack on the Bankruptcy Court's confirmation of the Final Plan; and (2)

---

[6]     Another tenant-shareholder had also objected to the Final Plan, but she withdrew her objections at the hearing in order to obtain the Life Occupancy Lease. *See* Hearing Tr., 15-BK-12178, Dkt. 157 at 28–32.

Dr. Blakley's appeal of the Bankruptcy Court decision was moot because it was commenced after the sale of the Property had closed. *See* Opinion, 20-AP-1004, Dkt. 6 at 11.  On May 22, 2019, the Second Circuit affirmed the District Court, finding that the appeal lacked an arguable basis either in law or fact. *See* Order Denying Appeal, 19-AP-1126, Dkt. 10-3 at 2.

On May 1, 2019, Amsterdam filed an adversary proceeding in Bankruptcy Court seeking a declaratory judgment against Dr. Blakely. *See* Appellee's Complaint, 19-AP-1126, Dkt. 1. Amsterdam sought (1) a judgment stating that Appellant had no rights in the apartment in which she resides and (2) a monetary judgment for all unpaid rent currently due and owing and for payments for continuing use and occupancy. *See* Opinion, 20-AP-1004, Dkt. 6 at 13.  On November 20, 2019, Amsterdam moved for summary judgment. *Id*.  Appellant opposed the motion and asserted several counterclaims against Amsterdam. *See* Opposition, 19-AP-1126, Dkt. 16.

On January 10, 2020, Dr. Blakely filed a separate adversary proceeding against Amsterdam. *See* Appellant's Complaint, 20-AP-1004, Dkt. 1.  In her complaint, Appellant sought to resolve what she alleged to be a dispute over ownership to the Property.  She also requested equitable recoupment of alleged damages to the value of her shares in the Coop. *See* Opinion, 20-AP-1004, Dkt. 6 at 14.[7]

On March 5, 2020, the Bankruptcy Court held a hearing on Amsterdam's (1) motion for summary judgment and (2) motion to dismiss Appellant's adversary proceeding.  The Court scheduled in-person oral argument on both matters for April 23, 2020. *See* Opinion, 20-AP-

---

[7]     Many of Appellant's allegations in her January 10, 2020 complaint were identical to ones she had made in her November 1, 2017 objections to the Final Plan and later in her May 11, 2018 Rejection Motion; those arguments had already been rejected by the Bankruptcy Court, the District Court, and the Second Circuit. *See* 20-AP-1004, Dkt. 6 at 11.  *Compare* Rejection Motion, 15-BK-12178, Dkt. 177 at 3–10 *with* Appellant's Objections to the Final Plan, 15-BK-12178, Dkt. 150 at 1–7 *and* Appellant's Complaint, 20-AP-1004, Dkt. 1 at 1–5.

1004, Dkt. 6 at 15.  Appellant did not appear for the oral argument, which had been converted to

a telephone conference in light of the COVID-19 pandemic.  *See* Order Denying Motion for

Reconsideration, Dkt. 1 at 10–11.  Appellee did not present oral argument and instead rested on

its papers.  *See* Opinion, 20-AP-1004, Dkt. 6 at 15.

       On June 8, 2020, the Bankruptcy Court dismissed Appellant's complaint in her adversary

proceeding and granted Appellee's motion for summary judgment in its adversary proceeding

("June 8 Order").  The Bankruptcy Court found that Appellant's arguments relating to the Loan

were barred by the doctrines of *Rooker-Feldman* and *res judicata*, *see* Opinion, 20-AP-1004,

Dkt. 6 at 17–18,[8] and that Appellant's rights to the Property had been terminated when the Final

Plan was confirmed, *see id.* at 17–22.  The Bankruptcy Court further found that Appellant owed

Amsterdam $36,000 in unpaid rent for her use of the Property after the February 1, 2018 sale.

*See id.* at 22–24.

       At the end of June 2020, Appellant filed a Motion for Reconsideration of the June 8

Order.  *See* Motion for Reconsideration, 20-AP-1004, Dkts. 8, 9.  In addition to other claims,

Appellant argued that her due process rights had been violated because she was unaware that the

April 23, 2020 hearing would still be held despite the COVID-19 pandemic.  *See* Motion for

Reconsideration, 20-AP-1004, Dkt. 9 at 2–3.  On July 27, 2020, the Bankruptcy Court denied the

Motion for Reconsideration.  *See* Order Denying Motion for Reconsideration, Dkt. 1 at 4–5.

       On August 11, 2020, the Bankruptcy Court entered judgment in favor of Appellee in its

adversary proceeding.  *See* Judgment, 20-CV-7458, Dkt. 1 at 4–5.  On the same day, the

Bankruptcy Court dismissed Appellant's adversary proceeding.  *See* Dismissal Order, 20-CV-

7459, Dkt. 1 at 4–5.  Given the interrelated nature of the two adversary proceedings, both the

---

[8]      The Bankruptcy Court additionally concluded that dismissal was warranted pursuant to the law of the case doctrine because Appellant's complaint raised claims substantially similar to those raised in the Rejection Motion, which had previously been denied.  *See* Opinion, 20-AP-1004, Dkt. 6 at 24–25.

Judgment and the Dismissal Order included the same three final orders: (1) a judgment declaring that Appellant had no tenancy rights to the Property; (2) a monetary judgment against Appellant, awarding Amsterdam $36,000 in unpaid rent; and (3) the dismissal of all of Appellant's counterclaims.  *See* Judgment, 20-CV-7458, Dkt. 1 at 4–5; Dismissal Order, 20-CV-7459, Dkt. 1 at 4–5.

Appellant then filed three separate lawsuits before this Court, each appealing a different order by the Bankruptcy Court.  Appellant is appealing: (1) the July 27, 2020 Order denying Appellant's motion for reconsideration of the June 8 Order; (2) the August 11, 2020 Judgment in favor of Appellee in its adversary proceeding; and (3) the August 11, 2020 Dismissal Order dismissing Appellant's adversary proceeding.[9]  The three appeals have been consolidated before the Undersigned and are the subject of this Opinion.[10]  On August 5, 2021, the Court heard oral argument from the parties.[11]

## LEGAL STANDARD

District courts have appellate jurisdiction over bankruptcy court rulings pursuant to 28 U.S.C. § 158(a)(1).  "A district court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*."  *Thakur v. S.J.P.B., Inc. (In re Thakur)*, 498 B.R. 410, 418 (S.D.N.Y. 2013) (citing *Overbaugh v. Household Bank, N.A. (In re Overbaugh)*, 559 F.3d 125, 129 (2d Cir. 2009)).  "A finding of fact is clearly erroneous if, after reviewing the evidence as a whole, 'the reviewing court is left with the definite and firm conviction that a mistake has been

---

[9]     Each lawsuit has a different S.D.N.Y. docket number: 20-CV-6771; 20-CV-7458; 20-CV-7459.

[10]     The parties filed one set of appellate briefs.  Appellant's opening brief, Dkt. 16, is cited as Mem. of Law.  Appellee's response, Dkt. 21, is cited as Resp.  Appellant then filed three reply briefs, Dkts. 26, 30, 32.  Those briefs are cited, respectively, as First Reply, Second Reply, and Third Reply.  Appellee then filed a sur-reply, Dkt. 24.  The sur-reply is cited as Sur-Reply.

[11]     Following oral argument, the parties agreed to participate in the Court-annexed mediation program.  *See* Letter, Dkt. 63; Mediation Referral Order, Dkt. 64.  After six months of mediation, during which Dr. Blakely had pro bono counsel, the parties were unable to reach a settlement.  *See* Text Entry, Dkt. 71.

committed.'"  *Id.* at 418–19 (quoting *In re AMR Corp.*, 490 B.R. 470, 475 (S.D.N.Y.2013)).  "A district court should not overturn a bankruptcy court decision if an error is harmless, meaning the error 'is not inconsistent with substantial justice or does not affect the substantial rights of the parties.'"  *Morse v. ResCap Borrower Claims Trust*, No. 14-CV-5800, 2015 WL 353931, at *3 (S.D.N.Y. Jan. 26, 2015) (quoting *Cavalry Constr., Inc. v. WDF, Inc. (In re Cavalry Constr., Inc.)*, 428 B.R. 25, 42 (S.D.N.Y. 2010), *aff'd*, 425 F. App'x 70 (2d Cir. 2011)).

A district court "may affirm [the bankruptcy court's decision] on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decision[] below."  *Freeman v. Journal Register Co.*, 452 B.R. 367, 369 (S.D.N.Y. 2010) (citing *Borrero v. Connecticut Student Loan Found.*, No. 97-CV-1382, 1997 WL 695515, at *1 (D. Conn. Oct. 21, 1997)).  But "any argument not raised in the bankruptcy court is considered waived and will not be considered by the district court, unless such a waiver would result in manifest injustice."  *In re Residential Cap., LLC*, No. 15-CV-3248, 2016 WL 796860, at *7 (S.D.N.Y. Feb. 22, 2016) (citing *Klein v. Civale & Trovato, Inc. (In re Lionel Corp.)*, 29 F.3d 88, 92 (2d Cir. 1994)).

Additionally, the Court grants a special solicitude to *pro se* litigants.  "Courts should go to lengths to ensure that inexperienced *pro se* litigants do not inadvertently forfeit rights or winning arguments; this 'special solicitude' includes a liberal construction of papers and a flexibility on some otherwise-rigid procedural rules."  *Tartt v. City of New York*, No. 12-CV-5405, 2014 WL 3702594, at *2 (S.D.N.Y. July 16, 2014) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010)); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[a] document filed *pro se* is 'to be liberally construed'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  Although the Court shows 'special solicitude' to *pro se* litigants, *pro se* litigants must still satisfy the relevant legal standards for their claims to succeed.  *See Traguth v. Zuck*, 710 F.2d 90, 95 (2d

Cir. 1983) (noting that proceeding *pro se* "does not exempt a party from compliance with relevant rules of procedural and substantive law") (internal citation omitted).

## DISCUSSION

Appellant raises several issues on appeal. Even liberally construed, none of Appellant's arguments has merit, and the three Bankruptcy Court decisions are affirmed.

### I.     The 2007 Mortgage Loan

Appellant argues that she was only in Bankruptcy Court because she was the victim of a predatory loan that should have been voided by the New York state court during the foreclosure action.[12]  *See* First Reply, 20-CV-6771, Dkt. 26 at 15. Liberally construed, Appellant argues that the Loan should be voided because: (1) it was not properly authorized and (2) it was predatory. *See* Mem. of Law, Dkt. 16 at 11–13, 32; First Reply, Dkt. 26 at 14–15.[13]

Putting aside many other problems with those arguments, Appellant faces an insurmountable obstacle: the Bankruptcy Court could not disturb the state court's judgment in the foreclosure action. The Bankruptcy Court held that the doctrines of *Rooker-Feldman* and *res judicata* prohibited it from considering any arguments related to the Loan. *See* Opinion, 20-AP-1004, Dkt. 6 at 18. The Court reviews *de novo* the Bankruptcy Court's legal conclusion that

---

[12]     Although none of the three decisions on appeal directly addresses the Loan, it was the Coop's default on the Loan that precipitated the bankruptcy filing, and it underlies all of Appellant's arguments. Additionally, the Bankruptcy Court addressed the Loan in the June 8 Order, *see* Opinion, 20-AP-1004, Dkt. 6 at 18, and Appellant is appealing the Bankruptcy Court's denial of her motion for reconsideration of that decision, *see* Order Denying Motion for Reconsideration, 20-CV-6771, Dkt. 1.

[13]     The Court finds that Appellant's two arguments are newly raised on appeal. "[A]ny argument not raised in the bankruptcy court is considered waived and will not be considered by the district court, unless such a waiver would result in manifest injustice." *Residential Cap., LLC*, No. 15-CV-3248, 2016 WL 796860, at *7 (S.D.N.Y. Feb. 22, 2016) (citing *Klein v. Civale & Trovato, Inc.* (*In re Lionel Corp.*), 29 F.3d 88, 92 (2d Cir. 1994)). Because Appellant had ample opportunity to raise those arguments before the Bankruptcy Court and because she raised those exact arguments in other lawsuits challenging the Loan, the Court finds that there is no manifest injustice here. But given Appellant's status as a *pro se* party, the Court will consider her arguments on the merits, even though they are not procedurally proper.

*Rooker-Feldman* and *res judicata* preclude the consideration of Appellant's arguments.  The Court finds that they do.

Pursuant to *Rooker-Feldman*, a district court is prohibited in certain instances from deciding cases that require the direct review of state court decisions.  *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005) (citing *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983)).  *Rooker-Feldman* applies when: (1) the federal court plaintiff lost in state court; (2) the plaintiff is complaining of injuries caused by a state court judgment; (3) the plaintiff's case would require the district court to review and reject that judgment; and (4) the state court judgment was rendered before the district court proceedings commenced.  *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (citing *Exxon Mobil*, 544 U.S. at 283–84).

Each of the four elements is met here.  First, Appellant lost in state court in June 2015, when 477 Funding won a judgment of foreclosure following the Coop's default on the Loan.  *See* Judgment of Foreclosure, 15-BK-12178, Dkt, 20-6; Opinion, 20-AP-1004, Dkt. 6 at 4.  Second, Appellant claims that she was injured by the New York Supreme Court's decision, which granted a judgment of foreclosure against the Property.  *See* First Reply, Dkt. 26 at 8.  Third, Appellant's requested relief would require this Court to undo the foreclosure.  *Id.*  And finally, the judgment of foreclosure was entered in June 2015, months before the bankruptcy petition was filed and years before Dr. Blakely filed the adversary proceeding at issue here.  *See* Opinion, 20-AP-1004, Dkt. 6 at 4.  Accordingly, upon *de novo* review, *Rooker-Feldman* applies, and it precludes review of the state court judgment.

In addition to the impact of *Rooker-Feldman*, the doctrine of *res judicata* also applies, and it also prevented the Bankruptcy Court from reviewing the legality of the Loan.  "[*R*]*es judicata*, or claim preclusion, provides that 'a final judgment on the merits of an action precludes

the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).  Moreover, "[i]n applying the doctrine of *res judicata*, [a court] must keep in mind that a state court judgment has the same preclusive effect in federal court as the judgment would have had in state court." *Burka v. New York City Transit Auth.*, 32 F.3d 654, 657 (2d Cir. 1994) (citation omitted).

Appellant attempted to pursue in Bankruptcy Court claims that had been fully litigated and decided in state court.  For example, in her November 13, 2007 state court complaint, Appellant alleged that "Pitts and Bey without the consent and approval of the board of directors obtained a suspicious 'mortgage' from defendant Madison for the sum of $650,000 to supposedly pay the City of New York for an *in rem* foreclosure claims [sic]."  2007 Complaint, Dkt. 16 at 194.  In her December 4, 2020 opening brief in this Court, Appellant asserted, "I am a victim of . . . this loan taken out by Shirley Pitts, Ken Bey, Margaret Callender and Nathaniel McLeon, without my knowledge, and behind my back, and without the consent of our Corporation Board."  Mem. of Law, Dkt. 16 at 32.[14]

The state court resolved Appellant's claims regarding the Loan.  Justice Tingling held that the Loan was not predatory because (1) there was no way for the Original Lenders to have known that Ken Bey, the managing agent who helped Pitts secure the Loan, did not have the authority to act on behalf of the Coop; (2) there was no evidence that the Original Lenders targeted the Coop because the shareholders were African American; and (3) Section 6-L(2)(k) of

---

[14]     Even if some of Appellant's claims concerning the validity of the Loan were not raised in the state court litigation, the doctrine of *res judicata* bars her from bringing those claims in federal court, because they could have been raised in the earlier state supreme court action.  *See EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (finding that the doctrine of *res judicata* precludes parties from "relitigating issues that were or could have been raised" in the earlier action (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 399 (2d Cir. 2000) (internal quotation marks omitted)).

the New York Banking Law only applies to home loans, and the Loan was a commercial loan. *See* State Court Opinion at 7–8.  Principles of *res judicata* prevented the Bankruptcy Court from reconsidering those findings, which have long been final.[15]

In short, upon *de novo* review, the Bankruptcy Court was correct that Appellant's claims with regards to the legality *vel non* of the Loan are barred by the doctrines of *Rooker-Feldman* and *res judicata*.  Accordingly, the terms of the Loan do not provide a basis to reverse the orders of the Bankruptcy Court that Dr. Blakely is appealing.

## II.     The Chapter 11 Reorganization Plan

Since reneging on her consent to the Final Plan at the November 1, 2017 hearing, Appellant has consistently argued that the Bankruptcy Court should not have confirmed the Final Plan.  In the June 8 Order, the Bankruptcy Court addressed Appellant's arguments regarding the Final Plan and found that they were barred by the doctrines of the law of the case and *res judicata*.  *See* 20-AP-1004, Dkt. 6 at 20, 25.  He confirmed those findings in the decisions being appealed.  *See* Order Denying Motion for Reconsideration, Dkt. 1; Judgment, 20-CV-7458, Dkt. 1; Dismissal Order, 20-CV-7459, Dkt. 1.

Appellant's arguments with respect to the Final Plan have been addressed on many different occasions, and, upon *de novo* review, this Court finds that the Bankruptcy Court correctly held that the law of the case doctrine and the doctrine of *res judicata* preclude further review.  "[T]he 'law of the case' doctrine is a rule of practice . . . that dictates that 'a decision on an issue of law made at one stage of a case becomes binging [sic] precedent to be followed in

---

[15]     Even if the Court could consider Appellant's argument that the Loan was unlawfully predatory under the New York State's Predatory Lending laws (which it cannot), Appellant would still be unable to obtain the relief she requested.  The New York State's Banking Laws require that a lawsuit under the statute "must be commenced within six years of origination of the high-cost home loan."  New York Banking Law § 6-L(6).  The six-year statute of limitations would have run in 2013, well before the bankruptcy matter had been commenced.

subsequent states of the same litigation." *Perreca v. Gluck*, 262 F. Supp. 2d 269, 272 (S.D.N.Y.

2003) (citing *In re Korean Air Lines Disaster*, 798 F. Supp. 755, 759 (E.D.N.Y. 1992)) .  "As

most commonly defined, the doctrine posits that when a court decides upon a rule of law, that

decision should continue to govern the same issues in subsequent stages in the same case." *Id.*

(quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)) (internal quotation marks omitted).

In her adversary proceeding complaint, Appellant argued that the Final Plan should have

been rejected for reasons that were nearly identical to the arguments she made in her Rejection

Motion.  *Compare* Rejection Motion, 15-BK-12178, Dkt. 177 at 3–10 *with* Appellant's

Complaint, 20-AP-1004, Dkt. 1 at 1–7.  Although Appellant raises different arguments now, the

issue on appeal is whether the Bankruptcy Court correctly concluded that Appellant's complaint

in the adversary proceeding raised substantially similar issues to those previously raised in her

Rejection Motion such that the law of the case doctrine would apply.  Upon a *de novo* review,

the Court finds that the adversary complaint and the Rejection Motion are substantially identical;

the Bankruptcy Court was correct to rely on the law of the case in dismissing Appellant's

adversary proceeding.

Additionally, *res judicata* bars the Court from considering claims, new or old, related to

the Final Plan.  "A bankruptcy court's 'order of confirmation is treated as a final judgment with

*res judicata* effect.'"  *In re Arcapita Bank B.S.C.(c)*, 520 B.R. 15, 21 (Bankr. S.D.N.Y. 2014)

(quoting *In re Indesco Int'l, Inc.*, 354 B.R. 660, 664 (Bankr. S.D.N.Y. 2006)).  The Final Plan is

final, and the appeal period has passed.  As Judge Koeltl found, and as upheld on appeal by the

Second Circuit, attempts to reconsider a Final Plan are an impermissible collateral attack.  *See*

District Court Opinion, 15-BK-12178, Dkt. 207 at 3; Order Denying Appeal, 19-AP-1126, Dkt.

10-3 at 2; Order Denying Reconsideration of Appeal, 19-AP-1126, Dkt. 10-3 at 4.  Accordingly,

the Bankruptcy Court correctly concluded that *res judicata* barred it from considering

Appellant's arguments related to the long-ago confirmed Chapter 11 reorganization plan.

Even if the Court could consider Appellant's arguments on their merits, none is

persuasive.  Appellant argues that the Final Plan was not in the best interest of the shareholders

because it failed to preserve their shareholder status, despite offering them lifetime leases.  *See*

Mem. of Law, Dkt. 16 at 13.  Appellant asserts that there were other buyers, such as Blue Rock

Holdings Inc., that proposed plans that would have allowed the tenants to remain in the building

as shareholders.  *See* Second Reply, 20-CV-6771, Dkt. 30 at 18.[16]  She further suggests that she

is owed compensation for her valuable property.  *See id.* at 20.

The Trustee considered other plans for reorganization of the Coop; he was, however,

unable to pursue any of them because of disputes among the shareholders.  *See* Opinion, 20-AP-

1004, Dkt. 6 at 5.  Additionally, given the mortgage debt that the Coop owed to 477 Funding, the

unpaid taxes owed to the City, the years of unpaid rent or maintenance payments individual

tenants owed the Coop, and the constant disputes among the shareholders, the Court cannot find

that the Final Plan was not in the best interest of the shareholders.  Moreover, the Court agrees

with the Bankruptcy Court that a traditional auction of the Property was unlikely to have yielded

a buyer that was willing to give the shareholders life occupancy leases.  *See* Hearing Tr., 15-BK-

12178, Dkt. 157 at 12.  In addition, the City found the reorganization plan consistent with the

goals of the HDFC program.[17]

---

[16]      Contrary to Appellant's argument, the Blue Rock Capital Holdings LLC proposal would also have converted the Coop's shareholders to tenants with lifetime leases.  *See* Blue Rock Plan, 15-BK-12178, Dkt. 101 at 12–13 ("'Life Tenancy Lease' shall mean a leasehold estate, whereby the Life Occupant is entitled to exclusive use and possession of the leased premises during the life of the Occupant as long as the Occupant continues to comply with the terms of the Life Occupancy Lease and is capable of residing in the premises.").

[17]      *See* Confirmation Order, 15-BK-12178, Dkt. 156 at 5.  At the November 9, 2017 hearing before the Bankruptcy Court, a representative from the City stated on the record that the City did not oppose the confirmation. *See* Hearing Tr., 15-BK-12178, Dkt. 157 at 41–42 ("[G]iven the sums of money that are owed to [Appellee], to the trustee, to the city, and various other parties it just didn't seem that there's any other way that this case could be

In sum, the doctrines of the law of the case and *res judicata* preclude the Court from reviewing the Final Plan.  But even if the Court could consider Appellant's arguments, there is no evidence supporting her claim that the Final Plan was not in the shareholders' best interest.  Accordingly, any purported deficiencies with the Final Plan do not provide a basis to reverse the Bankruptcy Court orders that are the subject of these appeals.

### III.       Authority of the Bankruptcy Court

Appellant next argues that the Court should overturn the Bankruptcy Court's decisions because the Bankruptcy Court lacked jurisdiction over the bankruptcy petition.  She contends that Shirley Pitts, who filed the bankruptcy petition in 2015, had no authority to do so because she was not the President of the Coop at the time.  *See* First Reply, Dkt. 26 at 12–13.  Appellant argues that the Bankruptcy Court, therefore, lacked jurisdiction to hear the Bankruptcy petition, requiring this Court to vacate the long-final orders of the Bankruptcy Court.  *See id.* at 16–19.

Appellant is correct that when a bankruptcy petition is filed by an unauthorized party, the bankruptcy court may not have jurisdiction over the bankruptcy case.  "[W]here a voluntary petition for bankruptcy is filed on behalf of a corporation, the bankruptcy court does not acquire jurisdiction unless those purporting to act for the corporation have authority under local law 'to institute the proceedings.'"  *Hager v. Gibson*, 108 F.3d 35, 39 (4th Cir. 1997) (quoting *Price v. Gurney,* 324 U.S. 100, 106 (1945)).

Appellant's argument about jurisdiction is, however, barred by *res judicata*.  *Res judicata* not only bars litigating claims that have already been made, but it also precludes litigation of claims that could have been made.  *See Burgos v. Hopkins*, 14 F.3d at 789 (quoting *Allen v. McCurry*, 449 U.S. at 94).  It is of no moment that the claims that "could have been made" in the

---

confirmed, and that at least this is preserving the affordable housing aspect of it at least for the lives of the current tenants.  So the city does not oppose confirmation.").

prior proceedings concern jurisdiction.  *See In re Kirwan Offs. S.a.R.L.*, 792 F. App'x 99, 103 (2d Cir. 2019); *In Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 152–54 (2009).  Because Appellant's argument that Pitts lacked authority to file the bankruptcy petition and that the entire bankruptcy should, therefore, be unraveled is a claim that she easily could have made at the time of the original bankruptcy filing, it is barred by *res judicata*.

But even if *res judicata* did not bar consideration of the jurisdictional question, and assuming without deciding that Appellant is correct that Pitts lacked authority to file the bankruptcy petition, Appellant's continued participation in the bankruptcy proceedings ratified Pitts' actions.  Under New York law, "[r]atification has been defined as the subsequent adoption and affirmance by one person of an act which another, without authority, has previously assumed to do for him while purporting to act as his agent."  *Leviten v. Bickley, Mandeville & Wimple*, 35 F.2d 825, 827 (2d Cir. 1929) (citing Floyd R. Mechem, *A Treatise on the Law of Agency* § 347 (2d Ed. 1914)).[18]

Appellant argues that she did not ratify the bankruptcy proceeding because (1) the Coop was not represented by counsel in the bankruptcy proceedings and (2) the Coop did not hold a board meeting at which it could ratify the bankruptcy petition.  *See* First Reply, Dkt. 26 at 21–22.  But Appellant's post-petition conduct was sufficient to ratify the filing, regardless of whether the Coop held a board meeting or was represented by counsel.  At the time the bankruptcy petition was filed, Appellant argued that Pitts was not the president of the Coop; but instead of contending that the governance dispute meant that the petition was filed without proper authority and should be dismissed, Appellant argued that she, rather than Pitts, should be allowed to prosecute the Chapter 11 case on the Debtor's behalf.  *See* Motion to Reject Voluntary

---

[18]   It is established law that ratification applies in the bankruptcy context.  *See In re Willis,* 345 B.R. 647, 653–54 (8th Cir. 2006) (holding a debtor "ratifie[s] [a] defective filing by actively participating in the bankruptcy case").

Dismissal, 15-BK-12178, Dkt. 24 at 10–11 (requesting that the Bankruptcy Court "appoint Dr. Delois Blakely as interim director of debtor Corporation for the purposes of prosecuting this Chapter 11 Bankruptcy proceeding, being that Dr. Delois Blakely has, since the filing of this proceeding, been acting to address the obligations of debtor Corporation in this proceeding").  Later in the proceedings, Appellant proposed a reorganization plan, even as she continued to dispute Pitts' authority to act on the Coop's behalf.  *See* Blue Rock Plan, 15-BK-12178, Dkt. 101 at 7.  By actively participating in the bankruptcy proceeding, Appellant ratified any defect that existed in the initial filing.

In short, *res judicata* bars any consideration of whether the Bankruptcy Court had jurisdiction.  But even if it did not, Appellant's actions during the bankruptcy proceedings ratified the filing, and it is too late for Appellant to argue otherwise.  Accordingly, questions regarding Pitts' authority *vel non* to file the bankruptcy petition do not warrant reconsideration of the Bankruptcy Court's orders.

## IV.    Appellant's Failure to Attend the April 23, 2020 Hearing

The Bankruptcy Court scheduled oral argument for April 23, 2020 on Appellee's motion for summary judgment in its adversary proceeding and on Appellee's motion to dismiss Appellant's complaint in her adversary proceeding.  *See* Opinion, 20-AP-1004, Dkt. 6 at 15. Appellant claims that she failed to appear at the oral argument because she was not informed that the hearing (held at the start of the COVID-19 pandemic) would be proceeding telephonically. She contends that the Bankruptcy Court's failure to inform her of the change of venue warrants reversal of the three orders being appealed.  *See* Mem. of Law, Dkt. 16 at 31, 65.[19]  The

---

[19]     This issue is part of Appellant's appeal because the Bankruptcy Court addressed her arguments related to her absence from the oral argument in its July 27, 2020 Order Denying the Motion for Reconsideration, one of the orders on appeal.  *See* Order Denying Motion for Reconsideration, Dkt. 1 at 10–11.  The Bankruptcy Court found that "[d]espite Dr. Blakely's continuing and extensive involvement in the above-captioned bankruptcy and adversary

Bankruptcy Court found that Appellant's absence from the April 23, 2020 hearing was not a basis for him to reconsider his June 8, 2020 decision. *See* Order Denying Motion for Reconsideration, Dkt. 1 at 11–12.

Assuming without deciding that the Bankruptcy Court erred in how it handled the change of venue for the oral argument, any error was harmless; it did not result in a denial of Appellant's due process rights[20] and oral argument would not have changed the outcome.

As an initial matter, there is no due process right to oral argument. *Greene v. WCI Holdings Corp.*, 136 F.3d 313, 316 (2d Cir. 1998) ("The circuit courts that have addressed the question of whether an oral hearing is required on motions to dismiss in civil cases have uniformly held that no oral hearing is required by the Due Process Clause."). More important, even if Appellant had appeared at the hearing, it would not have changed the outcome of the case.[21] As explained *supra*, these motions did not present close questions or nuanced application of relevant law. Appellant's claims all fail as a matter of law under the doctrines of *Rooker-Feldman*, *res judicata*, and law of the case. No matter how compelling or sympathetic Appellant might have been at oral argument, nothing could change the fact that Appellant's claims and her opposition to Appellee's claims were wholly without merit.[22]

---

proceedings over the past four years . . . Dr. Blakely failed to contact the Court to inquire about the status of the April 23, 2020 hearing to request an adjournment of the hearing date." *Id.* at 11.

[20]    Appellant claims that the Bankruptcy Court's decisions were "judgments pursued against me without due process." *See* Mem. of Law, Dkt. 16 at 44; *see also* Motion for Reconsideration, 20-AP-1004, Dkt. 9 at 3 ("Therefore, the decision to deny me and my daughter, . . . a severely disabled person, due process regarding the purported April 23, 2020 telephone conference is both arbitrary and capricious, is unfair and does not preserve our rights.").

[21]    Appellant disagrees, contending that "even though the Court insists I had nothing to add, I, for sure, believed I did have something fundamental to add." *See* Mem. of Law, Dkt. 16 at 27.

[22]    This Court did hold oral argument on these appeals and gave Dr. Blakely a significant period of time to advance her arguments. While she was passionate, passion cannot change the outcome; her arguments are without merit.

Thus, although it is unfortunate that Appellant was not informed about the change in venue for the hearing, any error was harmless, and it does not warrant vacating any of the Bankruptcy Court's orders.

## V.        Eviction

On August 11, 2020, the Bankruptcy Court granted Appellee a declaratory judgment that Appellant no longer had any occupancy, possessory, or leasehold rights. *See* Dismissal Order, 20-CV-7459, Dkt. 1 at 5 ("Blakely and [her daughter] do not retain any residual occupancy, possessory or leasehold rights"). Appellant alleges that the declaratory judgment was an eviction order, which may not be issued by a bankruptcy court.[23] *See* Mem. of Law, Dkt. 16 at 51–52. Appellant is not correct. The declaratory judgment itself is not an eviction order; it is merely a statement of Appellee's right to the apartment and Appellant's lack of right to the apartment. While the declaratory judgment seems likely to be a prelude to an eviction proceeding, the Bankruptcy Court's August 11 Order and Judgment do not require Appellant to vacate the apartment.

The Bankruptcy Court had the authority to issue the declaratory judgment, which was not an eviction order. Appellant's arguments to the contrary are without merit.

## VI.       The Bankruptcy Court's Grant of Summary Judgment to Appellee

Appellant next argues that the Bankruptcy Court erred when it granted summary judgment to Appellee in its June 8 Order. *See* Mem. of Law, Dkt. 16 at 45. The June 8 Order was never appealed. Because, however, Dr. Blakely moved for reconsideration of that Order, Motion for Reconsideration, 20-AP-1004, Dkts. 8, 9, and because she appealed the denial of the

---

[23]        The Bankruptcy Court had jurisdiction to enter the declaratory judgment. In its confirmation of the Final Plan, the Bankruptcy Court retained jurisdiction over Appellant's "rights to challenge all disputed claims and the purported rights of Queen Mother Blakely and her daughter . . . to remain in their apartment." *See* Confirmation Order, 15-BK-12178, Dkt. 156 at 11.

motion for reconsideration, Order Denying Motion for Reconsideration, Dkt. 1, and because she is a *pro se* litigant who must be accorded particular solicitude, the Court will consider her argument.[24]

This Court reviews the Bankruptcy Court's decision to grant Appellee summary judgment *de novo*.[25]  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The Court must 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  *Pandora Media, Inc. v. Am. Soc'y of Composers, Authors and Publishers*, 785 F.3d 73, 77 (2d Cir. 2015) (*per curiam*) (quoting *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)).  Courts "are less demanding of [*pro se*] litigants generally, particularly where motions for summary judgment are concerned."  *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) (citations omitted). This lower standard for *pro se* litigants does not, however, "relieve [the *pro se* litigant] of his duty to meet the requirements necessary to defeat a motion for summary judgment."  *Sec. & Exch. Comm'n v. Penn*, 225 F. Supp. 3d 225, 233 (S.D.N.Y. 2016) (cleaned up) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

---

[24]     Although the June 8 Order was not appealed, all of Appellant's arguments relate to that order.  Appellant filed a motion for reconsideration of the June 8 Order.  *See* Motion for Reconsideration, 20-AP-1004, Dkts. 8, 9. One of the orders on appeal is the denial of Dr. Blakely's motion for reconsideration.  *See* Order Denying Motion for Reconsideration, Dkt. 1.  In addition, the August 11, 2020 Judgment and Dismissal Order, both of which were appealed, affirmed the conclusions reached in the June 8 Order.  *See* Judgment, 20-CV-7458, Dkt. 1; Dismissal Order, 20-CV-7459, Dkt. 1.

[25]     "A bankruptcy court's decision to grant summary judgment is reviewed *de novo* because the existence of issues of material fact is a question of law."  *In re Enron N. Am. Corp.,* 312 B.R. 27, 28–29 (S.D.N.Y. 2004) (citations omitted).

As described *supra*, Appellant's claims in opposition to the motion for summary judgment all failed as a matter of law and do not turn on any questions of fact. Accordingly, upon *de novo* review, the Court affirms the Bankruptcy Court's decision granting Appellee's motion for summary judgment.

## VII.   Unpaid Rent

On August 11, 2020, the Bankruptcy Court awarded Appellee a judgment against Dr. Blakely for $36,000 in unpaid rent.[26]  *See* Judgment, 20-CV-7458, Dkt. 1 at 5; Dismissal Order, 20-CV-7459, Dkt. 1 at 5. The Bankruptcy Court found that, after confirmation of the Final Plan, Appellant no longer had any tenancy rights to the apartment. The Bankruptcy Court also found that, after the February 1, 2018 sale of the Property to Appellee, Appellee had the right to charge Dr. Blakely rent. *See* Opinion, 20-AP-1004, Dkt. 6 at 22–24.

Dr. Blakely's defense is a familiar refrain: she never agreed to give up her shares; she remains an owner of the Property; and she does not owe Appellee any rent. *See* Mem. of Law, Dkt. 16 at 18. The Bankruptcy Court correctly rejected Appellant's arguments. A confirmed final plan is binding on all parties to the bankruptcy case, including those who object to it. The Final Plan has been confirmed, and the time to appeal has long passed. *See* Fed. R. Bankr. P. 8002(a)(1), (d)(2)(F) (providing fourteen days to appeal an 11 U.S.C. § 1129 order and forbidding bankruptcy courts from granting an extension for appeals from an order confirming a § 1129 plan). Accordingly, the Final Plan is binding on Appellant, even though she objected to it. Pursuant to the Final Plan, the Coop was dissolved, *see* Final Plan, 15-BK-12178, Dkt. 133 at 15, and the Property was sold to Appellee, *see id.* at 1. In short, Appellant is no longer a

---

[26]     It appears that Appellant has not paid rent since the Coop was dissolved and that she was in arrears on her maintenance payments before the dissolution. *See* Rent Roll, 20-CV-6771, Dkt. 16 at 81 (stating that as of April 2016, Appellant owed the Coop $146,800 in "rent" arrears).

shareholder of the Coop, and she has no ownership interest in the Property or the Property's apartments.

Appellant further argues that she cannot owe rent because a "tenant has to have a lease," *see* Mem. of Law, Dkt. 16 at 57, and she "never [] had a lease signed with Amsterdam," *id.* at 58. That is not a correct statement of the law. By continuing to live in the apartment after the Property was sold to the Appellee, Appellant became something akin to a holdover tenant.[27] A landlord can demand rent from a holdover tenant to pay for use and occupancy up until a warrant of eviction is issued. *See* N.Y. Real Prop. Law § 220. Accordingly, the Bankruptcy Court was correct to find that Appellant owes back rent from the period of the sale through the date of judgment.

Appellant also argues that if she does owe rent, $36,000 is the wrong amount. *See* Mem. of Law, Dkt. 16 at 58. Appellee initially requested a judgment in the amount of $197,200 for unpaid rent, which included alleged payments due for certain periods prior to the February 1, 2018 sale of the Property. *See* Opinion, 20-AP-1004, Dkt. 6 at 23. The Bankruptcy Court found that it was not clear to whom payments were owed for periods prior to the sale of the Property. *Id.* Thus, the Bankruptcy Court concluded that Appellant only owed Appellee rent for use of the apartment after the sale of the Property closed on February 1, 2018. *Id.*

With respect to the amount owed, the Bankruptcy Court found that Appellant owes Appellee $1,200 for each month she has resided in the apartment following the February 1, 2018

---

[27] Appellee claims that Appellant is a squatter "with no legal or equitable rights as a former owner, tenant or holdover tenant." *See* Appellee's Reply, 20-CV-6771, Dkt. 53 at 4. Although not legally relevant, the Court notes that a squatter is someone who originally entered the premises illegally. *See Comm'r of Transp. v. Lane*, 148 Misc.2d 320, 325 (N.Y. Co. Ct. 1990) ("The principle is well settled, that one is not a squatter whose entry is with permission.") (citing *Matter of Robbins v. De Lee*, 34 A.D.2d 870 (3d Dep't 1970)). By contrast, a hold-over tenant is someone who occupies a property without any *current* rights to the property. *See In re Bridge Assocs. of Soho, Inc.*, 589 B.R. 512, 516 (Bankr. E.D.N.Y. 2018) ("A holdover tenant is one who remains in the premises without any vested right to remain there." (internal citation omitted)), *aff'd*, 779 F. App'x 827 (2d Cir. 2019).

sale, up to August 11, 2020, the date of the Judgment and Dismissal Order.  *See* Judgment 20-CV-7458, Dkt. 1 at 5; Dismissal Order 20-CV-7459, Dkt. 1 at 5.  The Court reviews the Bankruptcy Court's finding of fact for clear error.  *See In re Thakur*, 498 B.R. at 418.  The $1,200 rent amount comes from a "rent roll," which was maintained by the Chapter 11 Trustee; it shows that Appellant's base rent was $1,200 per month.  *See* Rent Roll, 20-CV-6771, Dkt. 16 at 81.[28]  During the bankruptcy proceedings, Appellant did not expressly dispute that was the amount owed;[29] nor does she claim that she ever made any monthly payments.  *See* Mem. of Law, Dkt. 16 at 58.  $1,200 per month for the 30 months between February 1, 2018 (the date of sale) and August 11, 2020 (the date of judgment) is $36,000.  Given the Bankruptcy Court's citation to the rent roll and the lack of Appellant's timely objection to the monthly amount owed, the Court finds no clear error in the Bankruptcy Court's determination that Appellant owes $36,000 in back rent.

In short, the Court affirms the Bankruptcy Court's finding that Appellant owes Appellee $36,000 for her use of the apartment between the date of the sale and the date of the Bankruptcy Court's Judgment and Dismissal Order.

## VIII.   Remaining Arguments

Appellant makes several other arguments in her briefs, which were made in passing and not developed.  "Although the Court shows "special solicitude" to *pro se* litigants," *pro se* parties "must still satisfy the relevant legal standards for their claims to succeed."  *In re Motors*

---

[28]     For unknown reasons, the Rent Roll indicates that Appellant was a tenant, rather than a shareholder.  *See* Rent Roll, Dkt. 16 at 81.  But it is unclear whether that designation affected the amount of base rent, as four of the occupants (two designated as shareholders and two listed as tenants) were listed as having a base rent of $1,200.  *Id.*

[29]     Appellant also argues that she cannot owe $36,000 because she is eligible for rent subsidies that she can apply to offset her rent.  *See* Mem. of Law, Dkt. 16 at 58.  Appellant's eligibility for rent subsidy is irrelevant to determining what she owes to Appellee in unpaid rent.

*Liquidation Co*., No. 15-CV-3307, 2015 WL 4523241, at *3 (S.D.N.Y. July 24, 2015) (citation omitted). The Court concludes that each of Appellant's remaining arguments lack an arguable basis in law or fact.

Although Appellant claims that the Bankruptcy Court did not take into account the special laws that govern HDFCs, *see* Mem. of Law, Dkt. 16 at 62–64, she fails to identify any particular instance in which a ruling of the Bankruptcy Court violated such laws. Moreover, as discussed *supra*, the Bankruptcy Court approved the reorganization plan only after the City represented that it did not oppose confirmation. *See* Hearing Tr., 15-BK-12178, Dkt. 157 at 41–42. The Bankruptcy Court noted that the City found the reorganization plan to be consistent with the HDFC program. *See* Confirmation Order, 15-BK-12178, Dkt. 156 at 5. Accordingly, this claim provides no basis to reverse the Bankruptcy Court's orders.

Appellant also claims that she is entitled to damages under the Fair Housing Act, although she does not explain why. Nor does she explain why that claim would require this Court to reverse any of the Bankruptcy Court's orders that she is appealing. *See* Mem. of Law, Dkt. 16 at 18. For a litigant to make out even a *prima facie* claim under the Fair Housing Act, she must show "at least minimal support for the proposition that the [housing provider] was motivated by discriminatory intent." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 73 (2d Cir. 2021) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)). Appellant has not demonstrated that Appellee has any discriminatory motive. The closest Appellant comes is her allegation that the lender who made the Loan was "[a] white man, aided and abetted by the two African American women shareholders, both of whom profited as part of the scheme." Mem. of Law, Dkt. 16 at 30. But that is not evidence that Appellee was motivated by discriminatory intent. As Appellee notes, it "was able to reach accommodations with all of the other tenants, Black and Brown, male and female, and it is the Appellant who reneged on her

written commitment and thereby caused the loss of her last opportunity to retain possession of her apartment." *See* Appellee's Reply, 20-CV-6771, Dkt. 53 at 2 n.2.  Even if Appellant could make out a claim under the Fair Housing Act, there is no conceivable connection between such a claim and the three orders of the Bankruptcy Court that she is appealing.  Accordingly, the Fair Housing Act does not provide a basis to reverse the Bankruptcy Court's orders.

Appellant further mentions that her daughter is disabled and, accordingly, that Appellee has violated the Americans with Disabilities Act ("ADA").  To state a claim under the ADA, plaintiffs must show "that [i] they are 'qualified individuals' with a disability; [ii] that the defendants are subject to the ADA; and [iii] that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities." *Henrietta D.* v. *Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).  "[I]n this Circuit, a plaintiff generally bears the burden of requesting an accommodation prior to bringing an ADA claim for [] denial" of a reasonable accommodation. *Walker v. City of New York*, 367 F. Supp. 3d 39, 51 (S.D.N.Y. 2019) (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006)).

The record is devoid of any request by Appellant for an accommodation for her daughter. Even without a request, however, it appears that Appellee very much took Appellant's daughter's disability into account when it offered to extend the Life Occupancy Lease to Appellant's daughter under the same conditions as it was offered to Appellant, *i.e.*, Appellant's daughter would have been allowed to remain in the apartment until the end of her life at a fixed, nominal rent.  Appellant unwisely rejected that offer. *See* Opinion, 20-AP-1004, Dkt. 6 at 6.

Appellant has provided no evidence that she or her daughter were entitled to ADA protections in the context of the bankruptcy proceedings, that Appellee violated the ADA, or that any ADA violation that might exist would require reversing any of the three orders on appeal.

In short, none of Appellant's remaining arguments warrants overturning the Bankruptcy Court's orders.

## CONCLUSION

For the reasons discussed above, the Bankruptcy Court's orders are AFFIRMED, and Appellant's appeals are DENIED.

The Clerk of Court is respectfully directed to terminate all open motions and to close the cases 20-CV-6771, 20-CV-7458, and 20-CV-7459.  The Clerk is further directed to mail a copy of this Opinion to Dr. Blakely and to note the mailing on the docket.

**SO ORDERED.**

Date:  **June 10, 2022**
     **New York, NY**

                             **VALERIE CAPRONI**
                            **United States District Judge**

Appendix

SCANNED ON 9/24/2013

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

(3

**PRESENT:** _Milton A. Tingling_
_____ **Justice**

PART __44__

_Madison Park Investors LLC_
_____

-v-

_477 West 142nd St Housing_
_Development Fund Corporation et al_

INDEX NO. _600313/2009_

MOTION DATE _____

MOTION SEQ. NO. _____

The following papers, numbered 1 to _____ , were read on this motion to/for _____

| | |
|---|---|
| Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s). _____ |
| Answering Affidavits —  Exhibits _____ | No(s). _____ |
| Replying Affidavits _____ | No(s). _____ |

Upon the foregoing papers, it is ordered that this motion is _granted in accordance with the attached memorandum of decision_

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):**
_____
_____

Dated: _9/7/13_ _____

_MGT_ _____ , **J.S.C.**

| | | |
|---|---|---|
| 1. CHECK ONE: ...................................... | □ CASE DISPOSED | ☒ NON-FINAL DISPOSITION |
| 2. CHECK AS APPROPRIATE: ...........................MOTION IS: | ☑ GRANTED    □ DENIED | □ GRANTED IN PART    □ OTHER |
| 3. CHECK IF APPROPRIATE: ............................... | ☑ SETTLE ORDER | □ SUBMIT ORDER |
| | □ DO NOT POST | □ FIDUCIARY APPOINTMENT    □ REFERENCE |

S/O

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

                                                     Part 44

-------------------------------------------------------------------------X

MADISON PARK INVESTORS LLC and E.R. HOLDINGS
LLC both New York Limited Liability Companies,

                                Plaintiffs,                Index No.: 600313/2009

                 v.

477 WEST 142nd STREET HOUSING DEVELOPMENT        <u>**Decision**</u>
FUND CORPORATION et al.

                                Defendants.

-------------------------------------------------------------------------X

JUSTICE Milton A. Tingling,

        Plaintiff moves for a judgment of foreclosure, defendant opposes the motion. What would

appear to be a simple case is the poster child for everything that is wrong with the HDFC

Program. Defendant (hereinafter "477"), entered into this program where tenants are able to form

corporations and purchase shares in buildings, which have become *in rem* owned by the city in

order to collect taxes and water/sewer charges. This program began in 1979, and defendant 477,

became an HDFC in 1982. The key players in this travesty are the plaintiff, Queen Mother

Doctor Delois Blakely (hereinafter "Queen Mother"), Bishop Shirley Pitts (hereinafter "Bishop

Pitts"), Ken Bey and Nathaniel McLeon.

        There were originally eight shareholders. Queen Mother was an original shareholder, who

at various times was Chair of the Board, President or simply a self designated person in charge.

Bishop Pitts, an original shareholder, was also at various times Chair of the Board, a board

member or an officer. Ken Bey was never a shareholder, and may or may not have been an

officer at some point. It was suggested during a proceedings that he and Bishop Pitts were

married. Finally, Nathaniel McLeon, who appeared in this action as well as a prior one, did so as

attorney for Ken Bey and defendant 477 West 142nd street HDFC.

HDFC Boards were charged with managing the buildings. For example: setting rents,

collecting rents, doing repairs, maintaining the premises and paying taxes.   The original rents

charged in this HDFC were around $300/ month. One of the benefits to the HDFC Program was

that after 15 years, the corporation could opt out of the program and become fee owners of the

building. The defendant here, as with many other HDFCs, over the years, found themselves

delinquent in the payment of taxes; in particular, real property taxes to the City of New York. In

order to address this rising problem, in 2003, the regulations were amended to provide tax

amnesties for HDFCs in return for obligating the corporations to remain in the program for 30

years.

Defendant 477, was eligible to sell or mortgage the premises without HPD approval after

1997. During this proceeding, this Court was perplexed as to how HPD could have allowed this

HDFC to fall into a situation which resulted in their taking out this ill advised loan– the subject

of this foreclosure. This Court directed that HPD be subpoenaed for an explanation. HPD

responded to the subpoena in the person of Ms. Ellis. Ms. Ellis is an assistant manager at HPD

and has been since 1968. Her particular duties include overseeing HDFCs. Ms. Ellis testified that

she became aware of the loan hearing issue with 477 after the loan was taken out in 2007.

However, she was aware of 477's tax delinquencies prior to the loan at issue. She also testified

that she had a long history with Queen Mother. Starting in 2003, she had discussions with Queen

Mother about tax amnesty; she also mentioned other programs such as AA loans, raising

Page 2

maintenance ceilings (raising the rent), and the Urban Homesteaders Assistance Board.  In

addition, Ms. Ellis met with Bishop Pitts before the loan was taken out; but Bishop Pitts had no

memory of discussing the amnesty program. Queen Mother has vehemently denied that she had

any discussion with Ms. Ellis concerning the tax amnesty with the City or any other programs

that would help the corporations relinquish their debts. Th Court gives credence to the testimony

of Ms. Ellis.

Richard Paul Stone (hereinafter "Stone"), an attorney licensed to practice in the New

York, was brought in as pro bono counsel for defendant 477 to assist with their *in rem*

proceeding.  He had a history of volunteer service to a number of not-for-profits. In an affidavit

submitted to the Court, which the Court hereby adopts as a court exhibit, Stone lays out his

history with defendant 477 and the actions which led up the loan that is at issue. His central

concern was to defend 477 in the in rem proceeding, as the City was preparing to move for

summary judgment. It was unclear to Stone which shareholders were trying to put a financing

package together for the corporation but he went ahead and consulted with Mitch Brand of RG

Mortgage anyway. Mitch Brand informed Stone that traditional lenders would not touch a deal

like [477's] because of the City's involvement, the issue with corporate governance and that in

dealing with people with limited business experience, there was a risk that even a market loan

could be deemed predatory since it could result in the loss of the building.

On June 11, 2007 Stone represented 477 on a motion in which the court determined that

they had four months to redeem by paying the outstanding changes. On June 14, 2007, a hard

money lender located by RG Mortgage, through a colleague of Stone, made a proposal and it was

presented to Queen Mother, with Stone's opinion that the terms were not attractive for their

Page 3

particular dilemma. As time passed with no progress Stone explained to Bishop Pitts and Ken

Bey that the possibility of a lender would require a professional property manager and that any

corporate decisions about financing "should be executed by meetings with [Stone] present." Ten

proposals were made by Stone, including but not limited to setting a deadline of August 2, 2007

for any other proposals so they would stay on track. However, there was a foreshadowing of

some problems brewing. There was a relationship between Bishop Pitts and Ken Bey that made

other board members uncomfortable; and there was a lot of traffic in and out of the building by

people claiming to inspect or obtain information for financing.

Stone set up a board meeting to settle some of these discrepancies. Queen Mother

objected to Ken Bey's presence at meetings, but by a 2-1 vote, the board allowed him to remain.

Bishop Pitts was copied on all communications. In addition, the board unanimously agreed to

make a counteroffer to the hard money lender of 11%, no more than 18 months and mo more the

three points. A representative from RG Mortgage made a presentation on August 1, 2007 for a

loan of $1.2 million for 18 months, to begin with an interest rate of 10.5% and three and a half

points, all designed to allow improvements to the building to generate revenue. By the end of day

on August 2, 2007, only two proposals were the ones initiated through RG Mortgage. Stone

never received a proposal from Ken Bey. On August 6, 2007 Stone notified Queen Mother and

Bishop Pitts that they received two proposals and that they should convene for a board meeting to

have at least one credit worthy individual sign on the corporations behalf, proof of corporate

formation and resolutions of the board to make the loan.

Within the next few days, there were letters and emails back and forth between Stone,

Bishop Pitts and Queen Mother. Thereafter, a special meeting was called with no notice given to

Page 4

all shareholders and Ken Bey became the chair. Stone, then sent a letter dated August 14, 2007 to

Queen Mother and Bishop Pitts in which he expressed his concerns about the corporations future.

The letter stated in part: *"When I called Secretary Margaret Callendar to try to move along the*

*calling of a meeting, she told me that Bishop Pitts has already made an agreement on the*

*corporations' behalf to borrow funds. If this were true, it would violate the board's resolution*

*and constitute an act ultra vires corporate authority."* Soon after, Stone received an email from

Ken Bey accusing him of improperly representing Queen Mother, rather than the corporation.

Stone believes that Ken Bey used that as an excuse for making his company's loan proposal in

direct contradiction to the unanimous vote he witnessed weeks before. Stone continued to try to

arrange a board meeting throughout the month of August to no avail.

On September 20, 2007, plaintiff and defendant entered into a commercial loan

agreement in which the plaintiff loaned the defendant $650,000. The loan was made on a one

year pre-credit interest, and a 15% interest rate; no appraisal was done and no credit check took

place, and it was to be repaid in 12 months. The HDFC's income through rental at most was

$5,000 per month. After the loan, plaintiff took approximately $96,000 in pre-loan interest. Real

estate taxes were approximately $275,000. In addition, there were assorted fees, costs and

expenses including but not limited to $5,000 which was paid to Ken Bey. At the end of the

subtractions, there was approximately $200,000 left which was supposed to be deposited in the

escrow account of the HDFC attorney, one Nathaniel McLeon.

The Court met Nathaniel McLeon (hereinafter "McLeon"), in a prior proceeding brought

by defendant 477, Ken Bey and Bishop Pitts against Queen Mother. During that proceeding, this

Court received a phone call from Kings County District Attorney's Office, stating that McLeon

Supreme Court Records OnLine Library - page 6 of 10

had been indicted by a Kings County grand jury for practicing law without a license. This Court

was subsequently informed that McLeon was also indicted on similar charges in New Jersey and

Queens County. Nevertheless, the day the Court was informed that McLeon was indicted in

Kings County, was the last day McLeon was ever seen. To the date of this decision, the Court has

received no information or accounting of the $200,000 allegedly placed in to the escrow account

of McLeon.

A representative from Madison Park Investors LLC testified that he drove passed the

building, 477 West 142nd street, and based on that viewing, decided to lend defendant 477 the

money. He never requested the rent rolls or any other documentation, and he never viewed the

inside of the building or its conditions. Based on his experience, he valued the building at

approximately $2 million; and on that basis alone, he approved the loan under the conditions

consummated. Ray Charles could have seen that at the time the loan was given, there was no

rational possibility that the loan could be repaid under the terms and conditions, without agreeing

to a loan under terms and conditions as had been proffered by Stone. When asked by the Court

how he expected defendant to repay the loan, he expressed no concern. It is duly noted by this

Court that there was no way this loan could have been repaid, which meant that there was an

impossibility *ab in itio*.

Predatory lending is the unfair, deceptive, or fraudulent practices of some lenders during

the loan origination process. Under the Fair Housing Act, the Court adopted a two prong test for

discrimination: first the plaintiff must establish the defendant's lending practices and loan terms

were predatory and unfair; and second the plaintiff must establish that defendant intentionally

targeted them because of their race or that the defendants lending practices had a disparate

Page 6

impact on the basis of race *Hargraves v. Capital City Mortg. Corp.,* 140 F.Supp.2d 7 (2000).

New York Banking Law § 6–L(2)(k) states that: "a lender or mortgage broker shall not make or arrange a high-cost home loan without due regard to repayment ability, based upon consideration of the resident borrower or borrowers' current and expected income, current obligations, employment status, and other financial resources (other than the borrower's equity in the dwelling which secures repayment of the loan), as verified by detailed documentation of all sources of income and corroborated by independent verification" *(emphasis added).*

Defendant 477 borrowed $650,000 from Madison Park Investors LLC, at a 15% interest rate, for 12 months, which they later defaulted on. The loan was taken out on behalf of the corporation, 477 West 142nd street Housing Development Fund because they were in arrears on both taxes and water/sewer charges. While Stone, counsel for defendant, made diligent efforts to bring proposals to the corporation's board meetings, there was inner turmoil within the shareholders structure. Two proposals were brought to the table by RG Mortgage: $1.2 million for interest rates of 11% and three points or 10.5% with three and a half points, both for 18 months. Mitch Brand, a mortgage broker who worked for RG Mortgage at the time, was concerned with the loans being deemed predatory, even if they were at market rate, because a default would result in the loss of the building. It was patently obvious that no loan or proposal would be deemed feasible without professional property management of the building and a complete fiscal overhaul.

Defendant cannot establish that Madison Park's lending practices and loan terms were predatory and unfair u. Ken Bey, who at the time the loan contract was made, was acting on behalf of the corporation; however, there was no way for plaintiff to know that Ken Bey's

Page 7

misrepresentation was false, when he sought them out to obtain the loan. The Court does note that while the terms of the loan, $650,000 at 15% interest rate to be repaid in 12 months sounds and is preposterous, defendant had two other proposals on the table, which they ignored. In addition, defendant cannot establish that plaintiff intentionally targeted them based on their race or that the lending practices had a disparate impact on the basis of race. There is no evidence to suggest that Madison Park agreed to the loan terms based on the fact that the shareholders of 477 were African American. Similarly in *Endeavor Funding Corp. v. Allen,* 102 A.D.3d 593 [1st Dept. 2013] the court held "by submitting proof of the existence of a mortgage and of default, plaintiff established a prima facie case for foreclosure. In opposition, defendant failed to raise a triable issue of fact as to plaintiff's involvement in a fraud." Here there is no evidence of predatory lending or fraud on plaintiff's part. In fact, what has occurred, is that the defendant borrowed money for a loan and when they defaulted, it resulted in a foreclosure.

During the closing two separate frauds occurred. The first involved the requirement that the HDFC provide copies of board minutes showing that a board meeting was held and approval of the loan. The affidavits provided by Secretary Callendar and Chair Bishop Pitts that such a board meeting was held and approval of the loan was voted on were fraudulent lies. The second involved Nathaniel McLeon fraudulently representing that he was an attorney licensed to practice law in the State of New York and placing the stolen $200,000 in an escrow account which *never* existed.

Finally, the Court notes emphasizes that New York Banking Law § 6–L(2)(k) applies only to home loans, and in this action, defendant 477, took out a commercial loan. Therefore, there are no home loan protections attach here.

Page 8 of 9

Plaintiff's motion for summary judgment is granted. Settle order on notice.


Dated: September 4, 2013

$$m9t$$

Milton A. Tingling J.S.C.

**JUDGE MILTON A. TINGLING**

Page 9 of  9